**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-52-RCL** |
| **NOLAN B. COOKE,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum. For the reasons set forth below, the government requests that this Court sentence Defendant Nolan B. Cooke to 11 months' incarceration, the middle of the applicable Sentencing Guidelines range; three years of supervised release; $2,000 in restitution; and the mandatory $100 special assessment for the count of conviction.[1]

## I.    INTRODUCTION

Cooke not only participated in but also urged others to join in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million in losses.[2] At this Court recently described it, "[w]hen members of the

---

[1] The government will submit video exhibits to defense counsel and the Court via USAfx in advance of the sentencing hearing.

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United

mob … arrived at the Capitol, the scene soon dissolved into chaos. Agitated protestors became enraged rioters. Rioters forced their way through police line perimeters and past metal barricades, assaulting officers and breaking Capitol windows in an attempt to reach the lawmakers inside. Many of these rioters were armed; they brought 'tire irons, sledgehammers, bear spray, and Tasers." *United States v. Craig Michael Bingert*, 1:21-cr-00091 (RCL), ECF 67, Opinion denying defendant's motion to dismiss Counts One, Three, Four, Five and Six (citations omitted), at p. 2.

Cooke, a high school graduate and cabinet maker from Savoy, Texas, helped lead the charge of rioters who broke through the police line guarding the east side of the Capitol building during the electoral vote certification. Cooke later bragged that he was one of the first to break through the barricade. Cooke and other rioters struggled with police officers who were protecting the restricted area. Cooke pushed against the bicycle rack barrier manned by police officers and encouraged other rioters to break through the police line, yelling obscenities along the way.

Once the rioters had broken through the barricade, Cooke rushed to the Capitol steps and then up to the building itself. At the top of the steps, Cooke and others were able to keep the vastly outnumbered officers on the defensive. Cooke used a flagpole carrying an American flag to strike one of the Capitol windows and encouraged other rioters to "smash the windows" and "break the glass." Cooke eventually left the restricted area without entering the building soon after his eyes became irritated with pepper spray. Cooke's actions on January 6 enabled other rioters to continue their assault on the Capitol, breach the building, and engage in violence, vandalism, and theft. Afterwards, Cooke was cooperative with law enforcement officers when they interviewed him during the execution of a search warrant at his residence on January 21, 2021.

---

States Capitol building and grounds and certain costs borne by the United States Capitol Police.

The government recommends that the Court sentence Cooke to 11 months' imprisonment, which is in the middle of the applicable Guidelines' range of 8-14 months. Such a sentence would reflect the gravity of Cooke's conduct but also acknowledge his early cooperation with law enforcement officials, admission of guilt, and lack of criminal history.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified Members of Congress, their staff, and others inside the building that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and

myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S.

Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, to date requiring the expenditure of more than 2.7 million dollars in losses.

**B.     Cooke's Role in the January 6, 2021 Attack on the U.S. Capitol**

Cooke's crimes on January 6 are documented through a series of videos he took on his GoPro digital camera that day,[3] witness interviews, and a voluntary statement Cooke made to the FBI before his arrest. Cooke's conduct in this case is described below.

### *1.   Approach to the Capitol*

On or about January 5, 2021, Cooke traveled from Texas to Washington, D.C., to attend a rally organized by supporters of former President Trump at the Ellipse in Washington, D.C. Before

---

[3] The eight GoPro videos will be submitted to the Court and the defense as exhibits. They were obtained via a criminal search warrant served on Cooke's residence before his arrest on January 21, 2022. The GoPro videos do not provide an accurate time stamp, but video footage of Cooke checking his phone at 2:10 p.m. and again at 2:32 p.m. provides a rough timeline for some of his actions described below. The time stamps included below are from the videos themselves. Because Cooke was behind the camera, his face cannot be seen, but often his long dark hair, hands (clad in black gloves), and arms (in a jean jacket) can be.

the rally on January 6, 2021, Cooke posted on his social media account a video of himself driving

to Washington, D.C.

> ### 2. *Cooke Joins the Front Lines of the Riot and Attempts to Break Through the Police Barricade*

After arriving at the Capitol building, Cooke at first milled about in the crowd, talking to

other rioters and his girlfriend. *See* Ex. 1. But at some point, Cooke joined the front lines of the

riot. Cooke then helped lead the charge of rioters breaking through the police barricade (consisting

of bicycle racks). Their first attempt did not succeed, but a second attempt did.

In the first attempt, Cooke joined a crowd of individuals shoving their way through a group

of U.S. Capitol Police officers in front of the east side of the Capitol. While in the crowd, Cooke

shouted and screamed at the officers, yelling, "Move the gates," "This is our fucking land," "This

is God's land," "We're taking this motherfucker," and "This is our fucking house," among other

things. Ex. 3 at 0.00-0.40. Cooke also pushed and shoved at the bike racks being used to block off

the restricted area. *Id.* at 0:40-1:00; *see* Ex. 3-1. Cooke encouraged other rioters as well, urging,

"Go," "Cheek to cheek, boys, cheek to cheek," and "Now, now, now!" *Id.* at 0.40-1:00. The police

officers succeeded in repelling the rioters and maintaining the barricade, however. *Id.* at 1:04-1:09.

At that point, Cooke raised his middle finger and pointed it at the police officers. *Id.*; *see* Ex. 3-2.

*Exhibit 3-1 (Showing Cooke's Gloved and Hand Grabbing Rack)*

*Exhibit 3-2 (Showing Cooke Raising Middle Finger)*





After this attempted breach, Cooke was enthusiastic, stating, "That was fun." Ex. 5 at 0:15-0:20. He told his girlfriend, "Text-text my dad and tell him that they-they almost fucking broke this." *Id.* at 1:04-1:10. Cooke next yelled to the crowd, "There's a storm coming" and "Here, piggy, piggy, piggy," and joined the crowd in chants of "USA, USA." *Id.* at 1:11-1:56. Cooke answered a telephone call and described the scene to the caller as "[f]ucking crazy. People almost just tried to broke [sic] through the gates. Yeah, we were right there. … I was pushing back on that shit. I almost go through…It's getting fucking hairy over here…I got the GoPro going." *Id.* at 3:06-3:35. A few minutes later, seeing some commotion, Cooke screamed, "Hold the line" and "Y'all won't hold us back," and rushed to the front of the crowd. *Id.* at 5:21-5:46; *see* Exs. 5-1 and 5-2.

*Exhibit 5-1 (Showing Cooke Facing Officers)*



*Exhibit 5-2 (Showing Cooke Facing Officers)*



Several minutes after the call, a man in the crowd with a bullhorn said that one of the officers had agreed to try to get permission for the crowd to get to the steps of the Capitol Building and asked the crowd to wait while the officer attempts to arrange this. *Id*. at 6:00-8:45. Cooke was

then at the front of the crowd of rioters, facing officers in riot gear. *See* Exs. 5-3 and 5-4. The crowd was growing restless.

*Exhibit 5-3 (Showing Cooke Facing Police in Riot Gear)*



*Exhibit 5-4 (Showing Cooke Facing Police in Riot Gear)*



### 3.   Cooke Breaks Through the Police Barricade

The officers continued to struggle to hold the racks in place, but eventually the restless crowd, including Cooke, broke through the police barricade on the east side of the Capitol at or just before 2:00 p.m.[4] Ex. 6 at 0:00-0:40. While in the crowd struggling with the officers manning the barricade, Cooke encouraged other rioters to "get them [the officers]" and "get these motherfuckers." *Id.* at 0:03-0:08. A rioter next to Cooke reached down and grabbed one of the bike racks. *Id.* at 0:04-0:07. Cooke grabbed onto the same rack and helped the rioter push the rack at the officers. *Id.*; *see* Exs. 6-1, 6-2, and 6-3.

---

[4] The GoPro video shows Defendant checking his phone at 2:10 p.m., which provides a rough timeline for his activities shown in Exhibit 6.

*Exhibit 6-1 (Showing Cooke Pushing Bike Rack)*



*Exhibit 6-2 (Showing Cooke Pushing Bike Rack)*



*Exhibit 6-3 (Showing Cooke Pushing Bike Rack)*



During some of the scenes depicted above, Cooke screamed, "We're coming through, we're coming through" and "This is our house. This is our fucking house, man." *Id*. at 0:08-0:19. Cooke also yelled at the officers to "join us, join us," "We want our fucking country," and "We're coming through," as he pushed against the barricade, other rioters, and an officer's riot shield to move past the officers and approach the Capitol steps. *Id*. at 0:20-0:50; *see* Exs. 6-4 and 6-6.[5] Cooke continued repeatedly shouting, "We want our country back." *Id*. at 0:44-1:00 & 1:23-1:30. In a screenshot below, he can be seen grabbing the arm of another rioter and pushing against the arm of an officer. *See* Ex. 6-6. Cooke paused to assist another rioter who had fallen, *id*. at 0:50-0:52, and then continued toward the Capitol steps, screaming. *Id*. at 0:53-0:58.

---

[5] Cooke's girlfriend can be seen in this video, at first behind and then briefly in front of the police barricade, as Cooke broke through. *Id*. at 0:28 (woman with black cap and brown hair holding American flag on left side of screen). Although she may have briefly entered the restricted area, she then quickly retreated away from the Capitol. The government does not have evidence of her directly impeding or interfering with law enforcement officers as Cooke did.

*Exhibit 6-4 (Showing Cooke Facing Officers)*



*Exhibit 6-5 (Showing Cooke Pushing a Riot Shield)*



*Exhibit 6-6 (Showing Cooke Pushing Past Officers)*



As Cooke approached the Capitol steps, he encountered a U.S. Capitol police officer who was retreating towards the building and who told Cooke to "[r]elax, man, relax." *Id*. at 1:04-1:06; *see* Ex. 6-7. Vastly outnumbered, the officers ran back towards the Capitol as the crowd pushed forward. *Id*. at 1:07-1:30. Cooke continued screaming, "We want our county back." *Id*. at 1:20-1:30. Cooke then reached a new line of police at the bottom of the Capitol steps at about 2:00 p.m. *Id*. at 1:40. Officers, stretched thin, stood behind removable posts linked by a flimsy chain. *Id*.; *see* Ex. 6-8.

*Exhibit 6-7 (Showing Officer Trying to Calm Cooke Down)*



*Exhibit 6-8 (Showing Officers at Bottom of Steps)*



Cooke and other rioters barely paused as they continued to push towards the building and Cooke yelled, "Get rid of that shit. Nothing's holding us back. Nothing's holding us fucking back. I'm not going to calm down." *Id*. at 1:45-2:05 & 3:20-3:24. A large crowd of rioters loomed in the background. *See* Ex. 6-9. The officers formed a line at the bottom of the steps and told the rioters to "stay back" and "calm down." *Id*. at 3:00-3:20 & 3:40-3:44. Cooke yelled, "This is a fucking revolution, dammit." *Id*. at 3:20-3:24. An officer cautioned him and others to "stay back." *Id*. at 3:24-3:25, and to stay off the steps. *Id*. at 3:48-3:51. The screenshot below shows how close Cooke was to the officers; his long hair can be seen in the upper right side of the frame. *See* Ex. 6-10.

*Exhibit 6-9 (Showing Crowd Behind Cooke)*



*Exhibit 6-10 (Showing Officers in Front of Cooke)*



While pushing against rioters as the officers struggled to contain them and sirens blared (*id*. at 4:00), Cooke shouted, "Stop the steal," and "U.S.A., U.S.A," aggressively chanting with the crowd. *Id*. at 4:35-4:43 and 6:00-6:17. A little while later, at about 2:05 p.m., Cooke yelled, "We're taking this motherfucker." *Id*. at 6:49-6:50. The crowd can be seen in the screenshot below, with Cooke's arm, gloved hand, and American flag. *See* Ex. 6-11.

*Exhibit 6-11 (Showing Crowd Behind Cooke)*



#### 4.   *Cooke Reaches the Top of the Capitol Steps*

Just after 2:05 p.m., the crowd climbed the steps to the Capitol Building. Cooke screamed, "Yeeeeaaahhhh," and then rushed up the steps with a massive crowd behind him. *Id*. at 7:25-7:33. The officers ran to the top of the steps, with Cooke and the other the rioters chasing them to the building. *Id*. at 7:40; *see* Ex. 6-12.

19

***Exhibit 6-12 (Showing Officers Running up Steps)***



As he reached the top, Cooke claimed that his eyes were burning. *Id*. at 7:53-7:55. Cooke nevertheless pushed through the crowd to the front, where the officers blocked the entrance to the building. *Id*. at 7:56-8:25; *see* Ex. 6-13. In his excitement, Cooke appeared to strike a woman's head with his flagpole. *Id*. at 8:08-8:12; *see* Ex. 6-14. He continued to scream, "We want Trump. We want Trump. We want Trump" and shake his fist and raise his middle finger at the officers. *Id*. at 8:28-8:35; *see* Exs. 6-15 and 6-16. Officers in riot gear attempted to control the crowd. *Id*. at 8:30-8:50; *see* Ex. 6-17. Cooke encouraged other rioters, yelling, "Get in there," and pushing against other rioters. *Id*. at 9:03-9:06; *see* Ex. 6-18.

*Exhibit 6-13 (Showing Cooke Climbing Staircase)*



***Exhibit 6-14 (Showing Cooke's Flagpole Against Woman Rioter's Head)***



*Exhibit 6-15 (Showing Cooke Raising Middle Finger to Officers)*



*Exhibit 6-16 (Showing Cooke Shaking Fist at Officers)*



*Exhibit 6-17 (Showing Officers Guarding Entrance)*



*Exhibit 6-18 (Showing Cooke Pushing a Fellow Rioter)*



Within two minutes of reaching the top of the steps, at about 2:07 p.m., Cooke and other rioters were at the East Rotunda (Columbus) doors of the Capitol. *Id*. at 9:09. Cooke, still holding the flagpole, pushed against the officers, who struggled to contain the crowd. *Id*. at 9:15 & 9:45-10:06; *see* Exs. 6-19 & 6-20. The officers continued that struggle for several minutes. *Id*. at 9:20-10:50. At one point, the video appears to show Cooke grabbing the edge of the Columbus doors before immediately being forced back. *Id*. at 9:25-9:42; *see* Ex. 6-21. An officer yelled to rioters to "get out." *Id*. at 9:43.

***Exhibit 6-19 (Showing Officers Attempting to Control Crowd)***



25

*Exhibit 6-20 (Showing Cooke Pushing Against Officer)*



*Exhibit 6-21 (Showing Cooke Pushing Against Columbus Door)*



Close to Cooke, two other rioters tried to discourage another rioter from using a weapon (a piece of wood with a metal hook attached). *Id*. at 10:55-11:16 & 14:25-14:33; *see* Ex. 6-22. At approximately 2:10 p.m., the video shows Cooke taking what appears to be a video of the crowd. *Id*. at 11:45-11:59; *see* Ex. 6-23.

***Exhibit 6-22 (Showing Rioter with Weapon)***



*Exhibit 6-23 (Showing Cooke Filming Crowd)*



At about 2:12 p.m., Cooke chanted with the crowd, "Let us in," sometimes adding, "Let us in, motherfuckers." *Id*. at 13:13-13:30 & 13:37-13:54. At another point, he sarcastically chanted, "Peaceful protest," *id*. at 15:20-15:35, but then resumed his calls to action to his fellow rioters, yelling, "Push, push," *id*. at 16:13-16:25; "Smash the windows. I'll crawl through it [sic]," *id*. at 16:45-16:55; "Stop the steal," *id*. at 17:25-17:40; "Bust the windows. We're the front lines. Front lines," *Id*. at 18:58-19:03, and "Break the glass" (along with other rioters). *Id*. at 19:52.

Cooke was present throughout the standoff between rioters and officers outside the Columbus doors that lasted for about 14 minutes, until about 2:19 p.m. At one point, he yelled that the officers were leaving and encouraged others to "[g]o, go, go, go… go, my troops. Go, go, go, go. This is fucking beautiful. Yeaaahh." Ex. 7 at 1:18-1:35. At first the crowd was screaming with excitement, but then people started covering their eyes. *Id*. at 1:34-1:48 & 2:02-2:09; *see* Ex. 7-1. Cooke then shouted, "they got tear gas." *Id*. at 2:10. Even after he saw other rioters covering and

28

rubbing their eyes and warned other rioters to cover their eyes, *id.* at 2:38-2:52, Cooke continued to encourage others to enter the building, shouting, "We're going in," and "Let's go." *Id.* at 3:06-3:11.

*Exhibit 7-1 (Showing Rioters Covering Their Eyes)*



### 5. *Cooke Strikes a Window with His Flagpole*

While Cooke was standing outside the Columbus Doors, at around 2:21 p.m., he asked, "Who's got a hammer," and another rioter repeatedly urged, "Break the window." *Id.* at 3:15-3:18. Cooke obliged by pushing through the crowd to get close enough to strike one of the already shattered windows on the right side of the Columbus doors with his flagpole. *Id.* at 3:18-3:44. Just to the left of Cooke, another rioter used a hammer to break one of the windows on the left side of the doors. *Id.*; *see* Ex. 7-2 Cooke was able to reach the window with his flagpole, striking it three times before pulling back. *Id.* at 3:57-4:06; *see* Ex. 7-3. Cooke then screamed and covered his eyes, apparently having been hit with pepper spray. *Id.* at 4:14-4:30.

29

*Exhibit 7-2 (Showing Rioter Using Hammer on Window)*



*Exhibit 7-3 (Showing Cooke Striking Window)*



Cooke initially retreated from the Capitol entrance, but then returned and joined a crowd of rioters, some of whom entered the building through the Columbus doors. *Id*. at 5:30-6:10 & 6:30-8:00.[6] The crowd started cheering around 2:26 p.m. After again getting within a few feet of the entrance, Cooke suddenly backed away and warned some of his fellow rioters about the tear gas. *Id*. at 9:00-9:20. Cooke ultimately did not enter the building.

Just after 2:30 p.m.,[7] Cooke moved away from the building and listened to another rioter discussing how others had broken through the barricades. *Id*. at 14:00-14:57. Cooke boasted in response, "I was one of the first ones to run through, man. It was fun. I got it all on GoPro." *Id*. at 15:00-15:03. Cooke laughed after he heard another rioter say, "Go get Nancy [Pelosi]. I want to scalp that bitch." *Id*. at 15:24-15:28. Between about 2:34 p.m. and 2:41 p.m., Cooke took selfie photographs of himself with the crowd. *Id*. at 15:52-15:59 & 17:50-18:00 and Ex. 8 at 2:24-3:01.

---

[6] Inside those doors, at about 2:24 p.m., a rioter approached the eastern Rotunda doors and used his shoulder to force them open. After rioters inside forced the door open—a feat made more difficult due to the size of the crowd outside—they pulled a police officer through the door, then worked to clear a logjam of bodies outside. Moments later, rioters outside began to pour into the Capitol building.

[7] The GoPro video shows Cooke checking his phone at 2:32 p.m., which provides a rough timeline for his activities at the Capitol shown in Exhibit 7 & 8. *Id*. at 13:39.

***Exhibit 7-4 (Showing Cooke Taking Selfie)***



At about 2:42 p.m., Cooke received a telephone call and told the caller he had been pepper sprayed and his face was "on fire" but that he was fine and could see. Ex. 8 at 3:02-3:15. He asked the caller if he/she was trying to leave and then said that he was on the steps of the Capitol. *Id*. at 3:20-3:25. At about 2:45 p.m., Cooke placed a telephone call, possibly to his girlfriend, and agreed to meet her on the grassy area. *Id*. at 6:40-6:57 & 8:11-8:15. Cooke then said, "We need to get out. We need to get out of here," stating he thought the police would start breaking up the crowd. *Id*. at 7:43-7:57.

Cooke finally left the restricted area around 2:47 p.m. *Id*. at 8:25-10:00

### 6.  *Cooke's Social Media Postings After the Riot*

After the riot, Cooke posted photographs of the events on his public social media accounts. In one photograph of Cooke with a woman believed to be his girlfriend, Cooke included a caption

32

stating, "I wouldn't want anyone other than you with me to take on the revolution." A caption in another photo stated, "What a fucking day."

### *Selfies Taken at the Capitol*



Cooke also posted videos of himself on the Capitol grounds on January 6, 2021, on his social media accounts. Cooke filmed these videos with a "GoPro" he wore around his neck during the day. Screenshots from those videos are included above.

### 7.   *Cooke's FBI Interview*

On January 21, 2021, Cooke was interviewed by the FBI and immediately admitted going to the Capitol, entering the restricted area, and recording the events on his GoPro. He voluntarily directed agents to the flash drive on which the recordings were saved and provided the following

statements and admissions, which are generally corroborated by the video evidence, except as noted below:

a.  A few days before January 6, 2021, Cooke saw a posting on Twitter from former President Trump about the rally in Washington, D.C., scheduled for January 6, 2021.

b.  On or about January 5, 2021, Cooke drove to Washington, D.C., with his girlfriend and a relative. On arrival, Cooke's relative dropped Cooke and his girlfriend off at the Capitol Building.

c.  Cooke brought one or more firearms with him on the trip, but he left those weapons in the relative's vehicle and did not bring them onto the Capitol Grounds.

d.  Cooke came to the Capitol because he had "questions for our Congress" and wanted his "voice to be heard."

e.  Cooke was at the front of the crowd pushing against the officers who were enforcing the restricted access to the Capitol Building and Grounds.

f.  Cooke claimed that no one was swinging at the police or anything like that and that there were even people denouncing the use of weapons.

g.  The barricades were at least 100 yards from the door of the Capitol. The protestors thought that the police were going to let them through the barricades so they could go to the front door of the Capitol. When that did not happen, the protestors became restless and eventually pushed past the barricades.

h.  Cooke "broke through the gate" at the Capitol.

34

    i.    Cooke pushed past police officers to get to one of the doors of the Capitol Building. He used a flagpole to bang on a window and saw another rioter chipping away at a nearby window with a hammer.

    j.    When Cooke got to the front door of the Capitol, he was pepper sprayed.

    k.    Cooke denied entering the Capitol Building at any time. Cooke stated he went "pretty much to the door" and then got pepper-sprayed and decided to leave because it "didn't feel right."

    l.    Cooke denied having any ill intent.[8]

    m.    When asked, "Looking back on it now, is there anything you would have done differently," Cooke stated, "I'd do it all over again. Maybe not-maybe not trying to push through, but I know what's in my heart." When asked what was in his heart, Cooke replied, "I want everybody just to live in peace."

    n.    When asked if he planned to attend future protests, Cooke said no and "I think what's done is done. I think I just need to let it go and let's not escalate this anymore."

### 8. *Injuries*

Although the government has no evidence that Cooke caused any physical injuries to any officers during the riot, his participation in this riot, particularly his persistent incitement of other rioters, caused numerous officers on the east side of the Capitol building to focus their efforts on preventing him and other rioters around him from entering the building. That thinned their ranks

---

[8] This statement is belied by Cooke's repeated exhortations to his fellow rioters to "get them" and "break the glass," as well as his cries of "we're taking this," as shown in the videos.

and helped those other rioters gain access to the building. Although the government cannot show that any of the persons who entered the Capitol building in the presence of Cooke were among those who injured officers and destroyed property, there can be no dispute that everyone who unlawfully entered the building contributed to the ensuing chaos that overwhelmed the police and led to assaults and vandalism.

## III.    THE CHARGES AND PLEA AGREEMENT

On January 21, 2021, the United States Attorney's Office (USAO) charged Cooke by criminal complaint with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); and Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D). On February 14, 2022, the USAO charged Cooke by information with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3).

On March 9, 2022, Cooke pled guilty to the information.

## IV.    STATUTORY PENALTIES

As noted by the plea agreement and the U.S. Probation Office, Cooke faces up to five years' imprisonment, a fine of up to $250,000, and a term of supervised release of not more than three years for Count One of the Information, Civil Disorder. Presentence Investigation Report (PSR) ¶ 4.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The parties have stipulated to the applicable Guidelines calculations, as follows:

18 U.S.C. § 231(a)(3)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a)[9] | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Specific Offense Characteristics (Offense involved physical contact) | +3[10] |
|  | **Total** | **13** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) |  | <u>-2</u> |
| **Total Adjusted Offense Level:** |  | **11** |

*See* Plea Agreement at ¶ 5(A).[11]

---

[9] The Guidelines instruct courts to apply the "most analogous offense guideline" when, as here, the offense is a felony for which no guideline expressly has been promulgated. U.S.S.G. § 2X5.1. If no Guideline is "sufficiently analogous," the court must apply "the provisions of 18 U.S.C. § 3553." U.S.S.G. § 2X5.1. Here, the parties and the Probation Office agree that the most analogous offense guideline for a violation of 18 U.S.C. § 231(a)(3) is U.S.S.G. § 2A2.4. Section 231(a)(3) criminalizes acts that "obstruct, impede, or interfere with" a "law enforcement officer" in the context of a civil disorder; Section 2A2.4 applies to "obstructing or impeding officers." (capitalization altered).

[10] As shown above, Cooke made direct contact with one or more officers during the riot.

[11] Based on the facts and circumstances of Cooke's case, the government is not seeking imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because a sentence within the Guidelines range of 8-14 months is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

37

In the PSR, the Probation Office agreed with that calculation. PSR ¶¶ 29-38. The U.S. Probation Office calculated the Cooke's criminal history as category I, which is not disputed. PSR ¶ 41. Accordingly, based on the government's calculation of Cooke's total adjusted offense level after acceptance of responsibility, at level 11, Cooke's Guidelines imprisonment range is 8-14 months' imprisonment. Cooke's plea agreement contains an agreed-upon Guidelines range calculation that is the same as that listed above. Plea Agreement at ¶ 5(C).

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

As in all cases, sentencing is also guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the § 3553(a) factors weigh in favor of a significant term of incarceration.

### A.     Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so

under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at Cooke's individual conduct, this Court must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, including: (1) whether, when, how Cooke entered the Capitol Building; (2) whether Cooke encouraged violence; (3) whether Cooke encouraged any acts of property destruction; (4) Cooke's reaction to acts of violence or destruction; (5) whether during or after the riot, Cooke destroyed evidence; (6) the length of Cooke's time inside of the building, and exactly where Defendant traveled; (7) Cooke's statements in person or on social media; (8) whether Cooke cooperated with, or ignored, law enforcement; and (9) whether Cooke otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to his or her fair and just punishment.

The nature and circumstances of Cooke's crimes weigh heavily in favor of a sentence in the middle of the applicable Guidelines range. As Cooke bragged to a fellow rioter and admitted to the FBI, he was one of the first rioters to break through the police line guarding the restricted area on the east side of the Capitol building. He also encouraged violence and acts of property destruction, urging others to "get" the officers, break through the barriers, and break the windows to the Capitol Building—and even struck one of the windows himself.[12]

---

[12] The government is not alleging that Cooke's striking of this window, which was very

Cooke continued to push the offensive, forcing the officers to continue retreating to the doors of the building itself. Cooke was undeterred by the large, unruly crowd of rioters, some with weapons, or the police officers, many in riot gear. Cooke ultimately was deterred only by a combination of the pepper spray, a fear that the crowd was going to be dispersed by law enforcement, and possibly the desire of his traveling companions to leave.

During the riot, Cooke bragged to a fellow rioter about breaking through the police line, claiming it was "fun." After the riot, Cooke celebrated the actions of the rioters. Cooke called the riot a "revolution" and captioned a selfie from the Capitol on January 6, "What a fucking day." These statements demonstrate a total lack of remorse in the days following the attack on the Capitol.

To be sure, when the FBI went to Cooke's residence to execute the search warrant, Cooke was cooperative and readily admitted his participation in the January 6 riot and directed agents to evidence of his crime. When asked if he would do anything differently now, Cooke stated that he would do it all over again—but maybe not push through the police barricades. At the same time, Cooke denied any plans to attend future protests and said he needed to let it go and not escalate anything further. His statements of contrition, even days after the riot, are at best equivocal.

The seriousness of this offense, including Cooke's interference with law enforcement guarding the Capitol and his encouragement of others to push through the barricades and break into the Capitol building, warrants a sentence of imprisonment of 11 months.

---

brief, resulted in any damage to the already broken window. But Cooke struck at the window while watching another rioter cracking the glass of a nearby window by striking it in a similar manner. Plainly, the totality of Cooke's actions outside the Columbus Doors on January 6 fully supported other rioters who entered the Capitol by force and caused damage to the building.

### B.  Cooke's History and Characteristics

Cooke is a high school graduate who has most recently worked as a cabinet maker. He has lived in Northeast Texas his entire life. He recalled having a good childhood with no instances of abuse, neglect, or financial instability. PSR ¶ 48. He reportedly had a normal upbringing." *Id.* Cooke reported the occasional use of alcohol and marijuana. *Id.* at ¶ 58.

Cooke has no criminal history. *Id.* at ¶¶ 41-43.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[13] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.

Cooke's criminal conduct—obstructing, impeding, and interfering with law enforcement during a civil disorder—shows a marked disrespect for the law. When Cooke entered the Capitol grounds, it was clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed and outnumbered. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and break into the U.S. Capitol are not taken seriously. In this way, a lesser sentence could

---

[13] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (FBI Director Wray's Statement), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

    **D.**    **The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[14] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

---

[14] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a significant term of incarceration.

Cooke has no criminal history. By his own account, he went to the Capitol to be heard and not with any ill intent. Once there, however, for reasons known only to him, Cooke went from calmly milling about in the crowd with his girlfriend to joining the front line of rioters in breaking through the police barricade, pushing past the police to climb the Capitol steps and reach the Capitol Building, and even attempting to smash a window of the Capitol Building, all the while screaming obscenities and encouraging other rioters to engage in violence and property damage.

Cooke had a choice. He could have left the area when his girlfriend did, or even earlier. He chose to stay, and his actions helped other rioters breach the Capitol Building and engage in violence, vandalism, and theft. Cooke's actions on January 6 show a complete disregard for the rule of law coupled with a willingness to incite violence. By his own words, he intended to "tak[e]

43

this motherfucker!" He continually screamed encouragement to others as well, directing other rioters to "get them," "get these motherfuckers," and "smash the windows," and screaming, "Nothing's holding us back," among other things. His actions that day show a willingness to violate the law and engage in acts of disorder. That he posted photos and videos of his actions on social media shows that he was proud of his conduct at the Capitol and wanted to publicize it.

Although the Cooke has now accepted responsibility, his statements in the days after January 6 tell a different story. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Cooke's boast to another rioter that breaking through the police barricade was "fun" and his commentary on social media of "what a fucking day" demonstrate that Cooke's sentence must be sufficient to provide specific deterrence from committing future crimes of violence. Cooke was also at best equivocal when it came to his expression of remorse and regret during the January 21 interview (discussed above), admitting that he would "do it all over again" but that he wanted "everybody to live in peace" and was hoping to let it go.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

45

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

As to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities— "'the Sentencing Guidelines are themselves an anti-disparity formula.'" *United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021) (quoting *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Generally, when a district court "correctly calculated and carefully reviewed the Guidelines range, [the district court] necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). Put another way, "'the best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.'" *Sanchez*, 989 F.3d at 541 (quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009)).

Additionally, the crimes that the Cooke and others like him committed on January 6 are unprecedented. For that reason, Cooke's violation of 18 U.S.C. § 231(a)(3) is not comparable to § 231(a)(3) offenses committed in other non-January 6 circumstances. To mechanically compare other § 231(a)(3) offenses other than those committed on January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

46

To date, only three January 6 defendants for whom the lead count of conviction was a violation of § 231(a)(3) have been sentenced: *United States v. Daniel Johnson and Daryl Johnson*, 21-cr-407-DLF, and *United States v. Aaron Mostofsky*, 21-cr-138-JEB.

Daniel Johnson, and his father, Daryl Johnson, entered the Capitol in the second wave of rioters on the west side, climbing through a broken window and then joining the crowd inside the building on the east side. The defendants helped other rioters overwhelm the outnumbered officers to allow more rioters to enter building through the Columbus doors on the east side, putting the officers and others at risk of injury. At the same time, there was no evidence that either defendant had physical contact with any of the officers. Although they appeared to be yelling in the surveillance videos, the government presented no evidence of the defendants' actual words. The defendants were in the Capitol Building less than 30 minutes. Both defendants pled guilty to Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). Daniel Johnson's Guideline range was 4-10 months, and Daryl Johnson's range was 0-6 months. The Court sentenced Daniel Johnson to 4 months and Daryl Johnson to 30 days' incarceration, reasoning that Daryl Johnson's criminal conduct was truly aberrant behavior for him and noting his strong family and community support, early acceptance of responsibility, and truthful statement to the FBI.

Mostofsky, dressed as a caveman and carrying a walking stick or rod, was among the first to breach the restricted area around the Capitol. He forcibly obstructed officers who were attempting to adjust barriers in the West Terrace area to keep rioters from entering the Capitol building. After impeding officers, Mostofsky joined the crowd breaking into the building itself and was in the first group of rioters to breach the Capitol building. Mostofsky stole protective gear, a Capitol Police bullet-proof vest and a riot shield. Mostofsky pled guilty to Civil Disorder, in

violation of 18 U.S.C. § 231(a)(3); Theft of Government Property, in violation of 18 U.S.C. § 641; and Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1). The Court determined the applicable Guideline range to be 10-16 months and sentenced Mostofsky to 8 months' imprisonment and 200 hours of community service. The Court appears to have relied on all the letters in support of Mostofsky; Mostofsky's good works and active community service; and Mostofsky's personal circumstances.

Cooke's conduct is distinguishable from that of the Johnsons. Cooke is in a higher Guideline range because his offense involved physical contact with the officers, as shown above. Whereas there was no audio recording of the Johnsons' statements during the attack, Cooke's taunts and exhortations to the mob to continue its attack are heard throughout the GoPro videos. Lastly, Cooke attempted to breach the building himself—by joining the front line of rioters pushing against the barricade and later surrounding the Columbus doors and by banging on the glass—as compared to the Johnsons, who seem to have only joined the crowd.

As to Mostofsky, the reasons for his variance are unique to his personal circumstances. Mostofsky's criminal conduct may be considered worse than Cooke's since Mostofsky entered the Capitol Building, was one of the first to do so, and stole government property, resulting in his guilty plea to 18 U.S.C. § 641. On the other hand, the government did not present evidence that Mostofsky, who pushed against officers and joined the rioters breaking into the building, vociferously encouraged other rioters to attack the police and the Capitol, as did Cooke.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir.

2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

Cooke's obstruction and interference with law enforcement officers guarding the east side of the Capitol enabled other rioters to breach the Capitol and engage in violence. This conduct merits a significant sentence. Accordingly, the instant recommendation does not constitute an unwarranted sentencing disparity.

## VII.  RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[15] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[15] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Cooke must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Fairlamb played in the riot on January 6.[16] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in May 2021. *Id.* Defendant's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 141.

---

[16] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 11 months' imprisonment, which is within the applicable Guideline range of 8-14 months, as calculated by the government and as agreed upon by the parties in the plea agreement; restitution of $2,000; and the mandatory $100 special assessment for the count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:    */s/Jolie F. Zimmerman*
Jolie F. Zimmerman
Assistant United States Attorney
D.C. Bar No. 465110
United States Attorney's Office for the District of
 Columbia
601 D Street, N.W.
Washington, DC 20530
(202) 252-7220
Jolie.Zimmerman@usdoj.gov